1  Daniel Cooper (SBN 153576)
2  daniel@CooperLewand-Martin.com
   Jesse C. Swanhuyser (SBN 282186)
3  jesse@CooperLewand-Martin.com
4  COOPER & LEWAND-MARTIN
   1004 O'Reilly Avenue, Ste. 100
5  San Francisco, CA 94129
6  Tel: (415) 360-2962

7
   Elizabeth Jones (SBN 326118)
8  Liz@lawaterkeeper.org
9  LOS ANGELES WATERKEEPER
   120 Broadway, Suite 105
10 Santa Monica, CA 90401
11 Tel: (310) 394-6162
   Fax: (310) 394-6178
12

13 Attorneys for Plaintiff
   LOS ANGELES WATERKEEPER
14

15            **UNITED STATES DISTRICT COURT**

16            **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 17  LOS ANGELES WATERKEEPER, a | Case No. _____ |
| 18  non-profit corporation, | |
| 19            Plaintiff, | COMPLAINT FOR DECLARATORY |
| 20 | AND INJUNCTIVE RELIEF AND |
| 21         vs. | CIVIL PENALTIES |
| 22  Basic Fibres, Inc., a California | |
| 23  corporation, DOES 1 through 10, | |
| 24            Defendants. | Federal Water Pollution Control Act, |
| 25 | 33 U.S.C. §§ 1251 to 1387 |

26

27

28

1    **I.      JURISDICTION AND VENUE**

2            1.      This is a civil suit brought under the citizen suit provisions of the Federal

3    Water Pollution Control Act (the "Clean Water Act" or "Act"), 33 U.S.C. § 1251, *et*

4    *seq*. This Court has subject matter jurisdiction over Los Angeles Waterkeeper ("LA

5    Waterkeeper" or "Plaintiff") and Basic Fibres, Inc.,[1] a California corporation, and

6    DOES 1 through 10 ("Basic Fibres" or "Defendant") (collectively the "Parties") and

7    over the subject matter of this action pursuant to section 505(a)(1)(A) of the Act, 33

8    U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the

9    United States).

10            2.      This complaint seeks relief for ongoing violations by Basic Fibres of the

11    Clean Water Act and both substantive and procedural requirements of the National

12    Pollutant Discharge Elimination System Permit No. CA S000001, State Water

13    Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by

14    Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ ("1997

15    Permit") and Order No. 2014-0057-DWQ ("2015 Permit") (collectively referred to

16    herein as the "General Permit"), related to polluted storm water and non-storm water

17    discharges from the industrial waste and refuse recycling facility owned and operated

18    by Basic Fibres at and near 6019 South Manhattan Place ("Facility") in Los Angeles,

19    California.

20            3.      The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–02

21    (power to issue declaratory relief in case of actual controversy and further necessary

22

23    _____

[1] Basic Fibres also uses the name Basic Fibers in filings with the State Water Resources Control Board.

COMPLAINT                                  2

1    relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief

2    and civil penalties); 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

3         4.      Prospective citizen plaintiffs must, as a jurisdictional pre-requisite to

4    enforcing the Clean Water Act in Federal Court, prepare a Notice of Violation and

5    Intent to File Suit letter ("Notice Letter") containing, *inter alia*, sufficient information

6    to allow the recipient to identify the standard, limitation or order alleged to be

7    violated, and the activity alleged to constitute a violation. 33 U.S.C. § 1365(a); 40

8    C.F.R. § 135.3(a).

9         5.      The Notice Letter must be sent via certified mail at least sixty days prior

10    to filing a complaint ("Notice Period") to the owner of the facility alleged to be in

11    violation of the Act, and where the alleged violator is a corporation, to the

12    corporation's registered agent for service of process. 33 U.S.C. § 1365(b); 40 C.F.R. §

13    135.2(a)(1).

14         6.      A copy of the Notice Letter must be mailed to the Administrator of the

15    U.S. Environmental Protection Agency ("U.S. EPA"), the Regional Administrator of

16    the U.S. EPA for the region in which a violation is alleged to have occurred, and the

17    chief administrative officer for the water pollution control agency for the State in

18    which the violation is alleged to have occurred. 33 U.S.C. § 1365(b); 40 C.F.R. §

19    135.2(b)(1)(A).

20         7.      On August 23, 2019, Plaintiff sent a Notice Letter via certified mail to

21    Basic Fibres and its registered agent for service of process describing ongoing

22    violations of the Act and General Permit at the Facility, and providing notice of its

23    intention to file suit against Defendant at the expiration of the 60-day Notice Period.

8.      Copies of the August 23, 2019 Notice Letter were sent via certified mail to the U.S. Attorney General, the Administrator and Regional Administrator of the U.S. EPA, the Executive Director of California's State Water Resources Control Board, and the Executive Officer of the Los Angeles Regional Water Quality Control Board ("LA Regional Board").

9.      The address for Basic Fibres to which the August 23, 2019 Notice Letter was sent is the Facility's address, which is the "owner/operator" address on file with the State Water Resources Control Board, and the LA Regional Board, for four different industrial facilities in Los Angeles currently subject to regulation under the General Permit that are owned/operated by Basic Fibres.

10.     The address for Basic Fibres to which the August 23, 2019 Notice Letter was sent is also listed as the company's "principal executive office" and "principal business office in California" in its corporate Statement of Information filed on July 12, 2019 with the California Secretary of State.

11.     The August 23, 2019 letter to Basic Fibres and its registered agent for service of process were returned with an indication that the addressee was no longer at the those addresses.

12.     On September 25, 2019, LA Waterkeeper re-sent the Notice Letter to Basic Fibres and its registered agent for service of process. A true and correct copy of the September 25, Notice Letter is attached as EXHIBIT A, the contents of which are incorporated by reference.

13.     The September 25, 2019 Notice Letter was signed for and received by Basic Fibres' agent for service of process on or before September 27, 2019.

14.     The September 25, 2019 Notice Letter sent to Basic Fibres' company address was marked "unclaimed" and returned to LA Waterkeeper's attorney by the U.S. Postal Service.

15.     More than sixty days have passed since the Notice Letter was served on Basic Fibres and the State and Federal agencies.

16.     Plaintiff is informed and believes, and thereon alleges, that neither the U.S. EPA nor the State of California has commenced or is diligently prosecuting a court action to redress violations alleged in this complaint.

17.     This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the Act. 33 U.S.C. § 1319(g).

18.     Venue is proper in the Central District of California pursuant to section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

LA Waterkeeper, a California non-profit corporation, by and through its counsel, hereby alleges:

## II.    <u>INTRODUCTION</u>

19.     This complaint seeks relief for unlawful discharges of polluted storm water and non-storm water from the Facility in violation of the Act and General Permit. Defendant's ongoing and continuous failures to comply with the discharge prohibitions, technology-based and water quality-based standards, planning and monitoring requirements, and other procedural and substantive requirements of the General Permit create liability under the Act. 33 U.S.C. §§ 1342, 1365.

20.     With every significant rainfall event, millions of gallons of polluted

storm water originating from industrial operations, like those conducted by Defendant, flow into Los Angeles' storm drains and contaminate local streams, creeks, rivers, beaches, bays, harbors and ocean water.

21.     The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering local creeks and rivers each year. *See e.g.* Bay, S., *Study of the Impact of Stormwater Discharge on Santa Monica Bay*, (Nov. 1999).

22.     Numerous scientific studies in recent decades have documented serious health risks to recreational users of southern California's waters from pollutant-loaded storm water and non-stormwater discharges. *See, e.g.,* Stenstrom, M. K., *Southern California Environmental Report Card: Stormwater Impact* at 15; Los Angeles County Grand Jury, *Reducing the Risks of Swimming at Los Angeles County Beaches* (1999- 2000) at 205; Haile, R. et al., *An Epidemiological Study of Possible Adverse Health Effects of Swimming in Santa Monica Bay* (Santa Monica Bay Restoration Project, 1996) at 5.

23.     During both dry and wet weather, many popular Santa Monica Bay and Los Angeles beaches remain unsafe for swimming. Fact Sheet for the Los Angeles Municipal Storm Water NPDES Permit (Dec. 13, 2001) at 3, 5-6; Stenstrom, M. K., *Southern California Environmental Report Card: Stormwater Impact* at 14-16.

24.     A landmark epidemiological study showed that people who swam directly in front of storm drain outlets into Santa Monica Bay were far more likely to experience fevers, chills, vomiting, gastroenteritis, and similar health effects than those who swam 100 or 400 yards away from the outlets. Los Angeles County Grand

1  Jury, *Reducing the Risks of Swimming at Los Angeles County Beaches* (1999-2000) at

2  205; Haile, R. et al., *An Epidemiological Study of Possible Adverse Health Effects of*

3  *Swimming in Santa Monica Bay* at 5.

4      25.    Los Angeles' waterways are ecologically sensitive areas, and are

5  essential habitat for dozens of fish and bird species as well as macro-invertebrate and

6  invertebrate species. The waterways provide aesthetic opportunities, such as wildlife

7  observation, and the public uses these waterways for activities such as water contact

8  sports and non-contact recreation.

9      26.    Industrial facilities, like Defendant's, that discharge storm water and non-

10  storm water contaminated with sediment, heavy metals, and other pollutants

11  contribute to the impairment of downstream waters and aquatic dependent wildlife,

12  expose people to toxins, and harm the special aesthetic and recreational significance

13  Los Angeles' waterways have for people in surrounding communities.

14      27.    Controlling polluted storm water and non-stormwater discharges is

15  essential to protecting southern California's surface and coastal waters.

16  **III.**   **THE PARTIES**

17      28.    LA Waterkeeper is a non-profit public benefit corporation organized

18  under the laws of the State of California with its main office located at 120 Broadway,

19  Suite 105, Santa Monica, California 90401. LA Waterkeeper is an organization of the

20  Waterkeeper Alliance, the world's fastest growing environmental movement.

21      29.    Founded in 1993, LA Waterkeeper is dedicated to the preservation,

22  protection and defense of the inland and coastal surface and ground waters of Los

23  Angeles County. The organization works to achieve this goal through education,

COMPLAINT         7

litigation, and regulatory programs that ensure water quality protection for all waterways in Los Angeles County. Where necessary to achieve its objectives, LA Waterkeeper undertakes enforcement actions under the Clean Water Act on behalf of itself and its members.

30.    LA Waterkeeper has members who live and/or recreate in and around the Los Angeles basin, including many who live and/or recreate along Ballona Creek, the Ballona Creek Estuary, and the Santa Monica Bay.

31.    LA Waterkeeper members use and enjoy local waters and waterways to fish, surf, swim, sail, SCUBA dive, kayak, bird watch, view wildlife, hike, bike, walk, and run. Additionally, LA Waterkeeper members use the waters to engage in scientific study through pollution and habitat monitoring, as well as restoration activities.

32.    The Basic Fibres Facility's unlawful discharge of pollutants into Ballona Creek, the Ballona Creek Estuary, the Ballona Creek Wetlands, and the Santa Monica Bay impairs the ability of Plaintiff's members to use and enjoy these waters. Thus, the interests of LA Waterkeeper and its members have been, are being, and will continue to be adversely affected by the Facility's failure to comply with the Act and General Permit.

33.    Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy, or adequate remedy at law.

34.    The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

35.    According to Basic Fibres' 2018 Storm Water Pollution Prevention Plan

("SWPPP"), the Facility's "[i]ndustrial processes may include manufacturing, cleaning, maintenance, recycling, disposal and any other activities related to the process."

36.    The Facility's primary industrial processes include receiving, sorting, cleaning, processing, baling, storing and transporting recyclable plastic, metal, paper and glass materials.

37.     Basic Fibres conducts equipment maintenance on the Facility's balers, forklifts, and front loaders/skip loaders.

38.    Basic Fibres receives, generates, stores and disposes of hazardous waste at the Facility.

## IV.    LEGAL BACKGROUND

### A.    The Clean Water Act.

39.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with other enumerated sections of the Act, including the section 301(a) prohibition on discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to section 402, 33 U.S.C. § 1342(b). *See* 40 C.F.R. § 122.26(c)(1).

40.    The Act requires all point source discharges of pollutants to waters of the United States be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

41.    Section 402(p) of the Act establishes a framework regulating industrial storm water discharges under the federal and authorized state NPDES permit programs. 33 U.S.C. § 1342(p).

42.     Section 402(b) of the Act allows each state to administer an NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water approved by the U.S. EPA. 33 U.S.C. § 1342(b).

43.     States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through the issuance of a statewide general NPDES permit applicable to all industrial dischargers and/or through individual NPDES permits issued to dischargers. *See Id.*

44.     The Facility's storm water discharges to the municipal separate storm sewer system, which conveys storm water and pollutants to Ballona Creek.

45.     Ballona Creek is a water of the United States.

46.     Section 505(a)(1) of the Act provides for citizen enforcement against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. §§ 1365(a)(1), 1365(f).

47.     "Effluent standard or limitation" is defined to include: (a) the prohibition in section 301(a) against unpermitted discharges; or (b) a condition of an NPDES permit such as the General Permit. 33 U.S.C. § 1365(f).

48.     Each separate violation of the Act subjects the violator to a penalty of up to $52,414 per day per violation for violations occurring after November 2, 2015; and up to $37,500 per day per violation for violations occurring prior to and including November 2, 2015. 33. U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

49.     Section 505(d) of the Act allows prevailing or substantially prevailing

parties to recover litigation costs, including fees for attorneys, experts, and consultants where it finds that such an award is appropriate. 33 U.S.C. § 1365(d).

**B.    California's Stormwater Permit.**

50.    The State Board is charged with regulating pollutants to protect California's water resources.  *See* Cal. Water Code § 13001.

51.    California is authorized by U.S. EPA to issue NPDES permits for storm water discharges associated with industrial activities. In this action, the relevant NPDES permit is the General Permit, which is issued by the State Board and is implemented by Regional Boards, including the LA Regional Board. *See* 33 U.S.C. §§ 1311(a), 1342, 1362(6), 1362(7), 1362(12).

52.    In order to discharge storm water lawfully, industrial dischargers in California must register under the General Permit and comply with all its terms; or obtain and comply with an individual NPDES permit. 33 U.S.C. § 1311(a); *see also* 1997 Permit, Finding 2; 2015 Permit, § I.A.12; 40 C.F.R. § 122.26(c)(1).

53.    Compliance with the General Permit constitutes compliance with the Clean Water Act for purposes of storm water discharges.  33. U.S.C. §§ 1311(b)(2)(A), 1311(b)(2)(E).  Conversely, "[General] Permit noncompliance constitutes a violation of the Clean Water Act and the [California] Water Code." 1997 Permit, § C.1; 2015 Permit, § XXI.A.

54.    The 2015 Permit superseded the 1997 Permit, except for enforcement purposes. *See* 2015 Permit, Findings, ¶ 6. Accordingly, Basic Fibres is liable for violations of the 1997 Permit and ongoing violations of the 2015 Permit, and civil penalties and injunctive relief are available remedies. *See Illinois v. Outboard Marine,*

*Inc.,* 680 F.2d 473, 480-81 (7th Cir. 1982) (relief granted for violations of an expired permit); *Sierra Club v. Aluminum Co. of Am.*, 585 F. Supp. 842, 853-54 (N.D.N.Y. 1984) (holding that the Clean Water Act's legislative intent and public policy favor allowing penalties for violations of an expired permit); *Pub. Interest Research Group of N.J. v. Carter-Wallace, Inc.,* 684 F. Supp. 115, 121-22 (D.N.J. 1988) ("[l]imitations of an expired permit, when those limitations have been transferred unchanged to the newly issued permit, may be viewed as currently in effect"); *see also CSPA v. River City Waste Recyclers*, 2016 U.S. Dist. LEXIS 120186, at *13-18 (E.D.Cal. Sep. 2, 2016).

55.     The 2015 Permit's terms are as stringent as, or even more stringent than, the 1997 Permit. *See* 2015 Permit, § I.A.6.

56.     Compliance with the General Permit requires that permittees consistently engage in four independent, but mutual-reinforcing actions: 1) executive planning and facility-specific pollution control design; 2) on-the-ground implementation of pollution control technologies; 3) monitoring storm water discharges for evidence of pollution; and 4) annual evaluation of the effectiveness of pollution control strategies, including corrective action where necessary.

57.     The General Permit's annual compliance period runs from July 1 to June 30 ("Reporting Year").

**C.     The General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.**

58.     The General Permit contains three principal substantive sections restricting contaminated discharges from the Facility. These three substantive sections

are called "Discharge Prohibitions," "Effluent Limitations" (a.k.a. technology-based standards), and "Receiving Water Limitations" (a.k.a. water quality-based standards).

59.     The General Permit contains a Discharge Prohibition on direct and indirect discharges to waters of the United States of liquid materials (e.g. vehicle or building wash water, chemical spills, etc.) other than storm water ("non-storm water discharges") that are not otherwise authorized by an NPDES permit. 1997 Permit, § A.1; 2015 Permit, § III.B.

60.     The General Permit also contains a Discharge Prohibition on storm water discharges and authorized non-storm water discharges that contain pollutants that cause or threaten to cause pollution, contamination, or nuisance as defined in section 13050 of California Water Code.  1997 Permit, § A.2; 2015 Permit, § III.C.

61.     In addition, the General Permit contains technology-based pollution abatement standards, or Effluent Limitations, requiring permittee facilities to reduce or prevent pollutants in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  40 C.F.R. §§ 401.15-401.16; 1997 Permit, § B.3; 2015 Permit, § VA.

62.     Compliance with the General Permit's technology-based standard requires that permittee facilities design and implement effective, site-specific pollution control strategies called Best Management Practices ("BMPs") that prevent or reduce storm water discharges consistent with BAT and/or BCT pollution reduction standards. 1997 Permit, Findings 1, 11, § B.3; 2015 Permit, § V.A.

63.     Permittees must design BMPs that meet the BCT standard for all sources of Total Suspended Solids ("TSS"), Oil and Grease ("O&G") and pH, 40 C.F.R. § 401.16, and thereafter implement and maintain, as well as evaluate and improve, such BMPs so as to ensure the concentration of TSS, O&G, and pH in any storm water discharge is controlled consistent with the BCT standard.

64.     Permittees must design BMPs that meet the BAT standard for all sources of toxic pollutants; and thereafter implement and maintain, as well as evaluate and improve, such BMPs so as to ensure pollutant concentrations in any storm water discharge are controlled consistent with the BAT standard.

65.     The 2008 and 2015 versions of U.S. EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities include numeric benchmark standards for pollutant concentrations in storm water discharges ("EPA Benchmarks"). *See* United States Environmental Protection Agency NPDES Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity, effective September 29, 2008 (as modified effective May 27, 2009) and effective June 4, 2015[2]; *see* 80 FR 34403, 34405 (June 16, 2015)

66.     EPA Benchmarks serve as objective measures for evaluating whether the BMPs designed and implemented at a facility achieve the statutory BAT/BCT standards. *See* 80 Fed. Reg. 34403, 34405 (June 16, 2015); *see also* 73 Fed. Reg. 56572, 56574 (Sept. 29, 2008); 65 Fed. Reg. 64746, 64766-67 (Oct. 30, 2000).

67.     Storm water discharges from an industrial facility containing pollutant

---

[2] https://www.epa.gov/sites/production/files/2015-10/documents/msgp2015_finalpermit.pdf

concentrations that exceed EPA Benchmark targets indicate that the facility needs to revise its BMPs to conform to BAT/BCT requirements. *See* 80 Fed. Reg. 34403, 34405 (June 16, 2015). The persistent discharge of storm water containing pollutant concentrations exceeding EPA Benchmark targets evidence a failure to develop, implement, and/or assess and revise pollution control strategies consistent with BAT/BCT standards. *See Santa Monica Baykeeper v. Kramer Metals, Inc.* ("*Kramer*"), 619 F. Supp. 2nd 914, 921-25 (C.D. Cal. 2009)

68.     Visual observation records and objective assessments of whether BMPs described in a SWPPP are consistent with industry best practices are relevant to assessing a permittee's compliance with the BAT/BCT requirements.

69.     The General Permit contains Receiving Water Limitations, also called water quality-based standards, which are intended to protect surface waters to which storm water is discharged. 1997 Permit, § C.1-1; 2015 Permit, § VI.A.

70.     The Facility's receiving waters include Ballona Creek, the Ballona Creek Estuary, Ballona Creek Wetlands, the Santa Monica Bay, and the Pacific Ocean (collectively "Receiving Waters"), all of which are waters of the United States.

71.     The Receiving Waters are an important community resource. Although pollution and habitat destruction have drastically altered the natural ecosystem, the Receiving Waters serve essential social, environmental, and economic functions.

72.     The General Permit's first Receiving Water Limitation prohibits discharges that cause or contribute to an exceedance of any applicable water quality standard. 1997 Permit, § C.1-2; 2015 Permit, § VI.A. Storm water discharges with pollutant concentrations that exceed levels contained in applicable water quality

standards are violations of the General Permit and the Act.

73.     Water quality standards may be numeric limits or narrative standards established by the State Board, the various regional boards, or the U.S. EPA to protect beneficial uses of the Receiving Waters.

74.     Beneficial uses of the Receiving Waters are defined in the *Water Quality Control Plan – Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties*, California Regional Water Quality Control Board, Los Angeles Region 4 (adopted June 13, 1994, as amended) ("Basin Plan").[3]

75.     The Receiving Water's designated beneficial uses include Municipal and Domestic Water Supply, Navigation, Commercial and Sport Fishing, Estuarine Habitat, Wetland Habitat, Water Contact Recreation, Non-Contact Water Recreation, Wildlife Habitat, Warm Freshwater Habitat, as well as Rare, Threatened, or Endangered Species Habitat. Basin Plan, Table 2-1.

76.     Water quality standards applicable to storm water discharges from the Facility include, *inter alia*, those set out in the Basin Plan and in the Criteria for Priority Toxic Pollutants for the State of California ("California Toxics Rule"). 65 Fed. Reg. 31712 (May 18, 2000); 40 C.F.R. § 131.38.

77.     Surface waters that cannot support designated beneficial uses (as listed in the Basin Plan) due to the occurrence of high levels of one or more pollutants are designated as impaired water bodies pursuant to section 303(d) of the Clean Water Act. 33 U.S.C. § 1313(d).

78.     According to the 2010 Integrated 303(d) List of Impaired Water Bodies,

---

[3] http://www.waterboards.ca.gov/losangeles/water_issues/programs/basin_plan/

Ballona Creek is impaired for cadmium, coliform bacteria, copper (dissolved), cyanide, lead, selenium, toxicity, trash, viruses (enteric), and zinc.[4] The 2014/2016 Integrated 303(d) List of Impaired Water Bodies lists Ballona Creek as impaired for copper, cyanide, indicator bacteria, lead, toxicity, trash, viruses (enteric), and zinc.[5]

79.   According to the 2010 Integrated 303(d) List of Impaired Water Bodies, the Ballona Creek Estuary is impaired for cadmium, chlordane, Coliform Bacteria, copper, dichloro-diphenyl-trichloroethane ("DDT"), lead, Polycyclic Aromatic Hydrocarbons ("PAHs"), Polychlorinated biphenyls ("PCBs"), silver, and zinc.[6] The 2014/2016 Integrated 303(d) List of Impaired Water Bodies lists Ballona Creek Estuary as impaired for cadmium, chlordane, DDT, copper, indicator bacteria, lead, PAHs, PCBs, silver, and zinc.[7]

80.   According to the 2010 Integrated 303(d) List of Impaired Water Bodies, the Ballona Creek Wetlands are impaired for trash.[8] The 2014/2016 Integrated 303(d) List of Impaired Water Bodies lists Ballona Creek Wetlands as impaired for trash.[9]

81.   According to the 2010 Integrated 303(d) List of Impaired Water Bodies, the Santa Monica Bay is impaired for DDT, debris, PCBs, and sediment toxicity.[10] The 2014/2016 Integrated 303(d) List of Impaired Water Bodies lists Santa Monica Bay as impaired for arsenic, DDT, mercury, PCBs, and trash.[11]

---

[4] https://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml
[5] https://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2014_2016.shtml
[6] https://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml
[7] https://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2014_2016.shtml
[8] https://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml
[9] https://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2014_2016.shtml
[10] https://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml
[11] https://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2014_2016.shtml

82.     The Basin Plan includes narrative and numeric water quality standards for inland surface waters and enclosed bays and estuaries for: chemical constituents, toxic substances, pH, oil & grease, suspended or settleable matter, and floating materials.

83.     U.S. EPA promulgated the California Toxics Rule based on a determination that numeric criteria were necessary to protect human health and the environment.

84.     Multiple metals discharged from the Facility, including but not limited to copper, zinc, lead and nickel, are classified as toxic pollutants pursuant to the Act's section 307(a)(1) at 40 C.F.R. § 401.15.

85.     The California Toxics Rule criteria "need to be attained at the end of the discharge pipe, unless the State authorizes a mixing zone. 65 Fed. Reg. 31701; *see also* 40 CFR § 131.38(c)(2)(i) (California Toxics Rule "criteria apply throughout the water body including at the point of discharge into the water body."); *see also Kramer*, 619 F.Supp.2d at 926-927.

86.     The General Permit's second Receiving Water Limitation is that pollutant concentrations in storm water discharges shall not adversely impact human health or the environment. 1997 Permit, § C.1; 2015 Permit, § VI.B. Storm water discharges with pollutant concentrations that adversely impact human health or the environment are violations of the General Permit and the Act.

87.     The General Permit's third Receiving Water Limitation is that concentrations of pollutants in storm water discharges shall not threaten to cause pollution or a public nuisance. *See* 2015 Permit, § VI.C. Storm water discharges with

1  pollutant concentrations that threaten to cause pollution or a public nuisance are

2  violations of the General Permit and the Act.

3       88.    Numeric water quality standards relevant to the Facility include, but are

4  not be limited to, those detailed in TABLE 1.

5  **TABLE 1**
WATER QUALITY STANDARDS RELEVANT TO THE FACILITY[12]

| PARAMETER | SOURCE | NUMERIC LIMIT |
|-----------|--------|---------------|
| pH | Basin Plan | 6.5-8.5 s.u. |
| Al | Basin Plan | 1.0 mg/L |
| Cu | California Toxics Rule | 0.013 mg/L* |
| Zn | California Toxics Rule | 0.120 mg/L* |
| Pb | California Toxics Rule | 0.065 mg/L* |
| Ni | California Toxics Rule | 0.470 mg/L* |
| Cr | Basin Plan | 0.016 mg/L* |
| Arsenic | California Toxics Rule | 0.34 mg/L* |

     89.    Storm water discharges with pollutant levels in excess of the Basin Plan standards, California Toxics Rule criteria, and/or other applicable water quality standards are violations of the General Permit's Receiving Water Limitations.

     90.    U.S. EPA has established a Total Maximum Daily Load ("TMDL") applicable to the Receiving Waters described in paragraph 70 of this complaint called the Ballona Creek Metals TMDL ("Ballona TMDL").

     91.    The Ballona TMDL is the calculation of the maximum amount of a

---

[12] Several of the California Toxics Rule limits are hardness dependent.  This means that the limit must be adjusted using the methods provided in Appendix J of the 2008 EPA Multi-Sector General Permit to account for Receiving Water sampling hardness, as applicable. Numeric limits with an asterisk (*) are measured in criterion maximum concentrations.

1    various metal pollutants that may enter for those waters to continue to meet water

2    quality standards.

3           92.    The TMDL assigns wasteload allocations to point sources that contribute

4    to the impairment, including to industrial storm water discharges; those allocations

5    establish the level of effluent quality that must be achieved to attain water quality

6    standards and support beneficial uses.

7           93.    The General Permit is the regulatory instrument used to implement the

8    TMDL wasteload allocations assigned to point sources, including the Facility. 40

9    C.F.R. 122.44(d)(1).

10          94.    The General Permit was amended in 2018 to incorporate Numeric

11   Effluent Limitations ("NELs") reflecting the wasteload allocations for copper, lead,

12   and zinc.

13          95.    The NEL for copper (total) of 0.0137 milligrams per liter ("mg/L").

14          96.     The NEL for lead (total) of 0.07675 mg/L.

15          97.    The NEL for zinc (total) 0.10477 mg/L.

16          98.    The NELs for copper, lead, and zinc in Ballona Creek will be effective in

17   July 2020.[13]

18          99.    Use of the Receiving Waters by LA Waterkeeper members and the public

19   for water contact recreation and fishing exposes people to toxic metals, pathogens,

20   bacteria and other contaminants in storm water and non-storm water discharges.

21          100.   Non-contact recreational and aesthetic opportunities, such as wildlife

22

23   _____
[13] *See* https://www.waterboards.ca.gov/water_issues/programs/stormwater/docs/industrial/
igp_factsheet_final.pdf

COMPLAINT                              20

1   observation, are also harmed by polluted discharges to the Receiving Waters.

2         **D.**     **The General Permit's Pollution Prevention Plan Requirements.**

3       101.  Permittees must develop and implement a Storm Water Pollution

4   Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit, §§

5   A.1.a, E.3; 2015 Permit, §§ I.I.54, X.B.

6       102.  The objectives of the SWPPP are to: i) identify and evaluate sources of

7   pollutants associated with industrial activities that may affect the quality of storm

8   water discharges; and ii) identify and describe site-specific BMPs to reduce or prevent

9   the discharge of polluted storm water from industrial facilities.  1997 Permit, § A.2;

10   2015 Permit, § X.C.

11       103.  The SWPPP must include, *inter alia*: i) a narrative description and

12   summary of all industrial activities, potential sources of pollution, and pollutants

13   associated with each potential source; ii) the identification and location where

14   materials are being shipped, received, stored, handled, as well as the typical quantities

15   of such materials and the frequency with which they are handled; iii) a description of

16   dust and particulate generating activities; iv) a site map indicating the storm water

17   conveyance system, associated points of discharge, direction of flow, and areas of

18   actual and potential pollutant contact, including the extent of pollution-generating

19   activities, nearby water bodies, and pollutant control measures; v) a description of

20   storm water management practices; vi) a description of the BMPs to be implemented

21   to reduce or prevent pollutants in storm water discharges and authorized non-storm

22   water discharges; vii) the identification of unauthorized non-stormwater discharges

23   and a description of how all such discharges have been eliminated; and viii) a

description of persons and their current responsibility for developing and implementing the SWPPP. 1997 Permit, §§ A.1-10; 2015 Permit, § X.E-I.

104.    The most important elements of any SWPPP prepared pursuant to the General Permit are the description of each industrial process occurring at the facility, the assessment of potential pollutant sources associated, and the identification of pollutants that may affect the quality of storm water ("Source Evaluation and Pollutant Assessment"). 1997 Permit, § A.2; 2015 Permit, §§ X.C, X.F, X.G.

105.    The 2015 Permit requires certain SWPPP enhancements relative to the 1997 Permit, including a more comprehensive assessment of potential pollutant sources, and more specific descriptions of BMPs to be implemented. *See* 2015 Permit, §§ X.G.2, X.G.4, X.G.5.

106.    Each of the industrial processes/activities undertaken at the Facility and described in paragraphs 35-38 are pollutant sources that must be described and assessed in each SWPPP for their potential contribution of pollutants in storm water discharges by Basic Fibres.

107.    The SWPPP must be evaluated and revised as necessary on at least an annual basis to ensure ongoing compliance. *See* 1997 Permit, §§ A.9-10; *see also* 2015 Permit, § X.B.

108.    Any failure to develop, implement, or revise a comprehensive SWPPP that contains all required elements is a violation of the General Permit and creates liability under the Act. 1997 Permit, §§ A.10.c-d, B.4.c; 2015 Permit, § X.B; *see also* 2015 Permit, Factsheet §II.I.1.

109.    The General Permit requires permittees to complete an Annual

1  Comprehensive Site Compliance Evaluation ("Compliance Evaluation"). 1997 Permit,

2  § A.9; 2015 Permit, § XV.

3      110.   The Compliance Evaluation must include: a review of all visual

4  observation records, inspection reports, and sampling analysis data; a visual

5  inspection of all potential pollutant sources for evidence of, or the potential for,

6  pollutants entering the drainage system; an evaluation of each BMP to determine

7  whether it is objectively adequate in light of monitoring and reporting plan data; an

8  assessment of BMP design and implementation effectiveness; a determination of

9  whether additional BMPs are needed to comply with the Permit; and a visual

10  inspection of equipment needed to implement the SWPPP. 1997 Permit, § A.9; 2015

11  Permit, § XV.

12      111.   The 1997 Permit requires that permittees submit an annual Compliance

13  Evaluation that includes an identification of personnel performing the evaluation,

14  date(s) of the evaluation(s) necessary to determine if SWPPP revisions are required, a

15  schedule for implementing SWPPP revisions, any incidents of non-compliance and

16  the corrective actions taken, and a certification that the permittee is in compliance

17  with the General Permit. 1997 Permit; §§ A.9.d.i-vi. If certification cannot be

18  provided, the permittee must explain in the Compliance Evaluation why the facility is

19  not in compliance, and report any anticipated noncompliance. 1997 Permit, § A.9.d.

20      **E.    The General Permit's Monitoring and Reporting Requirements.**

21      112.   The General Permit requires that permittees develop a written plan

22  containing the permittee facility's implementation, monitoring and reporting program

23  ("Monitoring Implementation Plan" or "MIP") along with its SWPPP. 1997 Permit,

1   §§ B.1-4, E.3; 2015 Permit, §§ X.I.1-5, XI.

2       113.   The primary objective of the MIP is to ensure compliance with the

3   General Permit's substantive requirements, including the technology-based BAT/BCT

4   standards and the Receiving Water Limitations.

5       114.   The MIP must be designed and implemented to evaluate the effectiveness

6   of BMP design and implementation. Information derived from the monitoring and

7   reporting plan informs permittees as to whether it must adapt BMP design or

8   implementation to ensure that storm water and non-storm water discharges are in

9   compliance with the General Permit. *See* 1997 Permit, § B.2; 2015 Permit, §§ X.I, XI.

10      115.   The MIP is an essential component in the General Permit's mandatory

11  "iterative self-evaluation process" whereby permittees must implement BMPs

12  contained in the SWPPP, evaluate BMP effectiveness using visual observation and

13  storm water sampling data, and then revise BMPs as necessary to consistently comply

14  with the General Permit's substantive mandate. *See* 1997 Permit, p. xiii.

15      116.   The MIP must include monthly visual observations of storm water

16  discharges and documentation pollutants present.  1997 Permit, § B.4.a; 2015 Permit,

17  § XI.A.

18      117.   Permittees are required to take corrective action to reduce or prevent any

19  observed pollutants from coming into contact with storm water and discharging to

20  waters of the United States. 1997 Permit, § B.4.c; 2015 Permit, § XI.A.3.

21      118.   The General Permit requires each permittee collect storm water samples

22  from each location where storm water is discharged from its covered facility. 1997

23  Permit, §§ B.5, 7: 2015 Permit, § XI.B.4.

COMPLAINT                                24

119.   The 1997 Permit required permittees to collect and analyze storm water samples during the first hour of discharge from the first storm event of the Reporting Year, and at least one other storm event in the Reporting Year. 1997 Permit, § B.5.a.

120.   Facility operators that do not collect samples from the first storm event of the Reporting Year are still required to collect samples from two other storm events of the Reporting Year, and must explain in the Annual Report why the first storm event was not sampled. *Id*.

121.   The 1997 Permit alternatively allows permittees to form and participate in a group monitoring program, under which participants must collected samples from two storm events over the 5-year life of the 1997 Permit.

122.   The 2015 Permit requires permittees to collect and analyze storm water samples from two Qualifying Storm Events within the first half of each Reporting Year (July 1 to December 31), and two Qualifying Storm Events within the second half of each Reporting Year (January 1 to June 30). 2015 Permit, § XI.B.2.

123.   The 2015 Permit alternatively allows permittees to participate in Compliance Groups. 2015 Permit, § XIV. Compliance Group Participants are only required to collect and analyze storm water samples from one Qualifying Storm Event within the first half of each reporting year (July 1 to December 31) and one Qualifying Storm Event within the second half of the reporting year (January 1 to June 30). 2015 Permit, § XI.B.3.

124.   The 1997 Permit provided for permittees to propose alternative monitoring procedures based on a facility's specific characteristics, 1997 Permit, § B.9, and also allowed several "Sampling and Analysis Exemptions," including for

facilities that infrequently discharge storm water to waters of the United States. 1997 Permit, § B.12. The 2015 Permit contains similar alternative monitoring procedures, but are available only upon submission via SMARTS of a written justification for any variance to standard monitoring requirements. 2015 Permit, XI.C.3-4.

125.   The 2015 Permit requires permittees to submit all sampling and analytical results for all samples via the State Board's online NPDES reporting database system—Stormwater Multiple Application and Report Tracking System ("SMARTS")—within thirty (30) days of obtaining each analytical report from a certified laboratory. 2015 Permit, § XI.B.11.a.

126.   Permittees must analyze each sample for as many as five sets of pollutants, including: 1) conventional pollutants (pH, TSS, and either total organic carbon or O&G), 1997 Permit, § B.5.c.i; 2015 Permit, §§ XI.B.6.a-b; 2) facility-specific pollutants identified in the pollutant source description and evaluation process, 1997 Permit, § B.5.c.ii; 2015 Permit, § XI.B.6.c; 3) pollutants for which the Receiving Waters are impaired ("Receiving Water Impairment Pollutants"), 1997 Permit, § B.5.c.ii; 2015 Permit, § XI.B.6.e; 4) Standard Industrial Classification code-based parameters, which are pollutants common to discharges from particular industrial activities, listed in the General Permit at Table D of the 1997 Permit and Table 1 of the 2015 Permit, 1997 Permit, § B.5.c.iii; 2015 Permit, § XI.B.6.d; and 5) Regional Board-mandated parameters, which are any additional pollutants identified by the relevant Regional Water Quality Control Board, 1997 Permit, § B.5.iv; 2015 Permit, § XI.B.6.f.

127.   The 1997 Permit required that permittees submit an Annual Report to the

1  applicable Regional Board by July 1 of each year, which had to include, *inter alia*, all

2  records collected in the MIP and the Compliance Evaluation.  The 2015 Permit

3  contains substantially identical requirements. 1997 Permit, § B.14.

4      128.   Permittees that fail to develop and implement an adequate MIP that

5  includes both visual observations and sampling and analysis are in violation of the

6  General Permit. 2015 Permit, § II.J.3.

7      129.   The 2015 Permit requires permittees to submit a Compliance Checklist

8  with each Annual Report that contains the following: i) an indication of whether the

9  permittee complies with, and has addressed all applicable requirements of, the 2015

10  Permit; ii) an explanation for any noncompliance with requirements within the

11  reporting year, as indicated in the Compliance Checklist; and iii) an identification,

12  including page numbers and/or sections, of all revisions made to the SWPPP within

13  the reporting year, and iv) the date(s) of the annual Compliance Evaluation. 2015

14  Permit, § XVI.

15      **F.      2015 Permit Exceedance Response Actions Requirements.**

16      130.   The 2015 Permit formalized the 1997 Permit's "iterative self-evaluation

17  process" with procedures for Exceedance Response Actions ("ERAs"). 2015 Permit, §

18  XII; *see also* 2015 Permit, Factsheet §II.K.1.

19      131.   The General Permit's ERA procedures require permittees to identify and

20  implement BMPs needed to comply with BAT/BCT technology-based effluent

21  limitations, and any more stringent water quality-based limitations necessary to meet

22  water quality standards.

23      132.   The ERA corrective action procedures are required when data from the

COMPLAINT                                    27

1   MIP demonstrates that BMPs are not sufficiently limiting storm water pollution to

2   comply with the General Permit's substantive provisions, including the technology-

3   based BAT/BCT standards and/or Receiving Water Limitations.

4        133.   Each permittee starts at baseline status ("Baseline"). 2015 Permit, §

5   XII.B; *see also* 2015 Permit, Factsheet §II.K.2.

6        134.   If pollutant concentrations in storm water samples exceed a Numeric

7   Action Limit ("NAL") for any parameter, the permittee is required to take an ERA for

8   any parameter(s) exceeding the NAL. 2015 Permit, §§ XII.B-C.

9        135.   The first time an NAL is exceeded for a parameter, the facility is elevated

10   from Baseline to Level 1 ERA status on the July 1 following the Reporting Year

11   during which it exceeded an NAL.

12        136.   By October 1 following commencement of Level 1 ERA status, the

13   permittee must use a Qualified Industrial Stormwater Professional to complete a Level

14   1 ERA Evaluation of the facility's industrial pollutant sources that are or may be

15   related to the NAL exceedances. 2015 Permit, § XII.C.1.

16        137.   The Level 1 ERA Evaluation must include a review of the facility's

17   SWPPP for compliance with the General Permit's technology-based BAT/BCT

18   standards, as well as any more stringent Receiving Water Limitations, an evaluation

19   of the industrial pollutant sources at the facility that are or may be related to the NAL

20   exceedance(s), and an identification of any additional BMPs that will eliminate future

21   exceedances. 2015 Permit, Factsheet §II.K.4.

22        138.   When conducting the Level 1 Evaluation, the permittee must ensure that

23   all potential pollutant sources that could be causing or contributing to the NAL

COMPLAINT                    28

1  exceedance(s) are fully characterized, that the current BMPs are adequately described,

2  that employees responsible for implementing BMPs are appropriately trained, and that

3  internal procedures are in place to track that BMPs are being implemented as designed

4  in the SWPPP. 2015 Permit, Factsheet §II.K.4. A permittee is also required to

5  evaluate the need for additional BMPs. *Id.* Level 1 ERAs are designed to provide the

6  permittee the opportunity to improve existing BMPs or add additional BMPs to

7  comply with the requirements of this General Permit. *Id.*

8      139.   Based on the Level I ERA Evaluation, and no later than January 1

9  following commencement of Level 1 ERA status, the permittee must revise its

10  SWPPP as necessary, implement additional BMPs identified in the evaluation, and

11  certify and submit a Level 1 ERA Report via the SMARTS database system. 2015

12  Permit, §§ XII.C.2.a.i-ii.

13      140.   The Level 1 ERA Report must include detailed descriptions of new

14  and/or revised BMPs that the permittee proposes to bring the facility into compliance

15  with the General Permit's technology-based BAT/BCT standards and Receiving

16  Water Limitations. 2015 Permit, § XII.C.1-2.

17      141.   If the facility exceeds the NAL for a parameter while it is in Level 1 ERA

18  status for that same parameter, then the facility is elevated to Level 2 ERA status.

19  2015 Permit, § XII.D. A permittee's status changes from Level 1 ERA status to Level

20  2 ERA status on July 1 of the Reporting Year following its receipt of sampling data

21  establishing persistent NAL exceedances. 2015 Permit, Factsheet §II.K.5.

22      142.   A facility in Level 2 ERA status must prepare a Level 2 ERA Action

23  Plan detailing how it will address ongoing NAL exceedances. 2015 Permit, § XII.D.1.

143.   The Level 2 ERA Action Plan identify which of three demonstrations the permittee will perform—an Industrial Activity BMP Demonstration, Non-Industrial Pollutant Source Demonstration, or Natural Background Pollutant Source Demonstration—as well as a proposed time frame for implementation. 2015 Permit, § XII.D.1; *see also* 2015 Permit, Factsheet § II.K.5.a.

144.   All elements of the Level 2 ERA Action Plan must be implemented as soon as practicable and completed no later than one year after submitting the ERA Level 2 Action Plan. 2015 Permit, § XII.D.1.d.

145.   On January 1 of the Reporting Year following the submittal of the Level 2 ERA Action Plan, permittees with Level 2 ERA status must certify and submit on SMARTS a Level 2 ERA Technical Report prepared by a Qualified Industrial Stormwater Professional. 2015 Permit, § XII.D.2; *see also* 2015 Permit, Factsheet § II.K.5.b.

146.   An Industrial Activity BMP Demonstration must include a description of the industrial pollutant sources and corresponding industrial pollutants that are or may be related to the NAL exceedances; an evaluation of those pollutants and their sources; and, where all of the permittee's implemented BMPs (including those detailed in the Level 2 ERA Action Plan) achieve compliance with the General Permit's technology-based and water quality-based standards, and are expected to eliminate future NAL exceedances, a description and analysis of all implemented BMPs. 2015 Permit, § XII.D.2.a.i-iv.

147.   Where all of a permittee's implemented BMPs (including those detailed in the Level 2 ERA Action Plan) achieve compliance with the General Permit's

1    substantive requirements, but are not expected to eliminate future NAL exceedances,

2    the permittee's Level 2 ERA Technical Report must include, in addition to a

3    description and analysis of all implemented BMPs, an evaluation of any additional

4    BMPs that would reduce or prevent NAL exceedances, estimated costs of additional

5    BMPs evaluated, and an analysis describing the basis for the selection of BMPs

6    implemented in lieu of the additional BMPs that were evaluated but not implemented.

7    2015 Permit, §§ XII.D.2.a.iv.

8        148.   Permittees that need additional time to submit the Level 2 ERA

9    Technical Report are automatically granted a single time extension of up to six

10   months upon submitting to SMARTS a written request that includes the reasons for

11   the time extension; a revised Level 2 ERA Action Plan including a schedule and

12   detailed description of the necessary tasks still to be performed to complete the Level

13   2 ERA Technical Report; and a description of any additional temporary BMPs that

14   will be implemented while permanent BMPs are being constructed. 2015 Permit, §

15   XII.D.5.

16       149.   A permittee "that does not fully comply with the Level 1 status and/or

17   Level 2 status ERA requirements . . . is in violation of [the] General Permit." 2015

18   Permit, § I.M.63; *see also* 2015 Permit, Factsheet § II.J.3.

19       150.   Carrying out the mandatory corrective action process triggered by

20   entering Level 1 or Level 2 status does not amount to compliance with the General

21   Permit's technology-based or water quality-based mandates. 2015 Permit, § I.M.63.

22   **V.    STATEMENT OF FACTS**

23       151.   Basic Fibres is a "person" pursuant to the Act. *See* 33 U.S.C. § 1362(5).

1

152.   Basic Fibres owns and operates the Facility.

2

153.   The Facility participated in a group monitoring program under the 1997

3

Permit, and is a Compliance Group Participant under the 2015 Permit. The group is

4

called the Paper, Glass, and Plastic Recyclers Monitoring Group (PGPRMG).

5

154.   The Facility's primary Standard Industrial Classification ("SIC") code is

6

5093 (scrap and waste materials).

7

155.   Basic Fibres has not identified any secondary or tertiary SIC codes

8

applicable to the Facility.

9

156.   Additional SIC codes applicable to the Facility's industrial activities,

10

even though not identified by Basic Fibres, include SIC codes 4953 (refuse systems),

11

4231 (terminal and join terminal maintenance facilities for motor freight

12

transportation), and 4212 (local trucking without storage).

13

157.   Basic Fibres owns and operates a fleet of approximately seven trucks at

14

the Facility.

15

158.   Basic Fibres' United States Department of Transportation ("U.S. DOT")

16

number is 2651667.

17

159.   Facilities with industrial activity classified as SIC code 5093, 4953,

18

4231, and 4212 are subject to General Permit regulation, i.e. must enroll in and

19

comply with all terms and conditions.

20

160.   The 1997 Permit required facilities classified under SIC code 5093 to

21

analyze storm water samples for, *inter alia*, iron, lead, aluminum, copper, zinc, and

22

chemical oxygen demand. 1997 Permit, Table D.

23

161.   The 2015 Permit requires facilities classified under SIC code 5093 to

analyze storm water samples for, *inter alia*, iron, lead, aluminum, zinc, and chemical oxygen demand. 2015 Permit, Table 1.

162.   The 1997 Permit and 2015 Permit both require facilities classified under SIC code 4953 to analyze storm water samples for, *inter alia*, ammonia, magnesium, chemical oxygen demand, arsenic, cyanide, lead, mercury, selenium, and silver.

163.   The Facility first filed a Notice of Intent to comply with the terms and conditions of the General Permit on March 27, 1992. Basic Fibres subsequently filed Notices of Intent on March 9, 1998, June 19, 2015, and May 15, 2017.

164.   Basic Fibres lists the Facility address as 6019 South Manhattan Place, Los Angeles, California 90047 on all four Notices of Intent described in paragraph 163.

165.   According to Basic Fibres' permit registration documents, industrial operations at the Facility span three additional addresses (1818 West 60th Street, 6015 South Manhattan Place, and 6025 South Manhattan Place).

166.   The three addresses identified in paragraph 165 span four distinct Assessor's Parcel Numbers ("APNs"), including 6001-017-006, 6001-017-005, and 6001-017-004.

167.   Basic Fibers' permit registration documents describe the Facility as a 2.059-acre site with 100% impervious surfaces.

168.   The Facility's industrial operations occur on additional, undisclosed properties along South Manhattan Place and West 60th Street, including at 6105 South Manhattan Place (APN 6001-017-003), 6121 South Manhattan Place (APN 6001-017-002), and 6129 South Manhattan Place (APN 6001-017-001) and the strip

of land immediately to the West of these properties (APN 6001-017-800).

169.   Basic Fibres also conducts industrial operations on public property beyond the boundaries of the addresses and APNs described in paragraphs 164-168, on South Manhattan Place and West 60th Street.

170.   Industrial activities conducted by Basic Fibres on public property include, but may not be limited to, the loading and unloading of industrial materials, and the storage of industrial materials in roll-off dumpsters.

171.   Paper products, glass, plastic, and metal materials have been and continue to be tracked and/or blown throughout the Facility, and onto South Manhattan Place and West 60th Street. As a result, trucks and vehicles leaving the Facility via the two driveways are also pollutant sources by tracking metal, plastic, and glass (and the contents of metal, plastic, and glass containers), paper, dirt, oil and grease, and other pollutants off site.

172.   Trash and pollutants from the Facility are not adequately controlled and are dispersed for blocks around the Facility.

173.   The Facility's primary industrial processes include receiving, sorting, cleaning, processing, baling, storing, and transporting recyclable plastic, metal, paper, and glass materials.

174.    Basic Fibres conducts vehicle and equipment maintenance on its truck fleet, balers, forklifts, and front loaders/skip loaders at the Facility.

175.   Basic Fibres receives, generates, stores, and disposes of hazardous waste at the Facility.

176.   While some industrial processes occur under roof, each of the Facility's

industrial processes has the potential to contribute conventional and/or toxic pollutants to storm water discharged to the Receiving Waters.

177.    Each of the industrial processes undertaken by Basic Fibers at the Facility, and on the public streets surrounding the Facility, is a pollutant source that, pursuant to the General Permit, must be disclosed, assessed, and controlled to prevent or limit pollutant concentrations in storm water discharges.

178.    Storm water flowing over the Facility collects suspended sediment, dirt, metals, and other pollutants, which are discharged to the Receiving Waters.

179.    According to Basic Fibres' permit registration documents, storm water exposed to industrial pollutants at 6019 South Manhattan Place, 6015 South Manhattan Place, 6025 South Manhattan Place, and 1818 West 60th Street is discharged from three discharge points, including one onto West 60th Street, and two onto South Manhattan Place.

180.    Storm-water exposed to industrial pollutants at 6105 South Manhattan Place, 6121 South Manhattan Place, 6129 South Manhattan Place, and the strip of land immediately to the West of these properties is discharged from as many as three additional discharge points not identified in Basic Fibres' permit registration documents.

181.    Basic Fibers' industrial activity results in prohibited discharges of non-stormwater, including process waters discharged from Facility's equipment washing, in violation of the Permit and the Clean Water Act.

182.    Basic Fibres identified the Facility's Receiving Waters as Ballona Creek in its SWPPPs dated July 2016 (signed December 20, 2016 by David Sanchez), June

2017 (signed June 14, 2017 by Alex Trujillo), and July 2017 (signed December 28, 2017 by Alex Trujillo).

183.   Basic Fibres' Notices of Intent dated March 23, 1992, June 19, 2015, and May 15, 2017 also identify the Facility's Receiving Waters as Ballona Creek.

184.   Storm water discharged from the Facility flows to municipal separate storm sewer ("MS4") storm drain inlets on South Manhattan Place, West 60th Street and/or Western Avenue.

185.   According to Basic Fibres' 1992 Notice of Intent, storm water flows from the Facility into a storm drain approximately 100 feet away from the Facility on West 60th Street.

186.   Data from U.S. EPA[14] and the City of Los Angeles[15] confirm that the MS4 inlets that receive the Facility's storm water discharges direct flows to Ballona Creek.

187.   BMPs implemented at the Facility have not prevented, and will not prevent, the Facility's pollutant sources from causing the discharge of pollutants to waters of the United States.

188.   Basic Fibres stores industrial materials and conducts industrial activities within and beyond the Facility boundary without adequate BMPs, including, but not limited to, exposure minimization BMPs (e.g. storm resident canopies, storm water

---

[14] *See* U.S. EPA's NPDES Stormwater Discharge Mapping Tool, https://www.epa.gov/npdes/epas-stormwater-discharge-mapping-tools (last visited April 1, 2019).
[15] Counsel confirmed that the MS4 inlets in question connect to Ballona Creek through a series of phone conversations with Tuyen Lee of the Los Angeles City Public Works Department between March 29, 2019 and April 3, 2019. *See also* Storm Drain System, https://data.lacity.org/A-Livable-and-Sustainable-City/Storm-Drain-System/pjh9-xwfn (last visited April 3, 2019).

containment structures), in violation of the General Permit.

189.   Basic Fibres conducts vehicle and equipment maintenance, fueling, and washing activities outside without adequate BMPs to prevent unauthorized non-stormwater discharges and polluted stormwater discharges in violation of the General Permit.

190.   Basic Fibres has collected and analyzed samples of storm water discharges at the Facility (or arranged for their collection and analysis) since at least 2001.

191.   Basic Fibres has certified under penalty of law permit registration documents to the LA Regional Board containing some of these analytical results, which are summarized in EXHIBIT B.

192.   EXHIBIT B establishes that storm water discharges from the Facility consistently contain pollutant concentrations above both EPA Benchmarks and applicable water quality standards.  For example, after three years of purportedly trying to remedy acknowledged pollution problems under the 2015 Permit's Exceedance Response Action process, on January 19, 2019 the concentration of iron in the Facility's storm water discharge was 27.7 milligrams per liter (compared to the EPA Benchmark of 1.0 milligrams per liter).

193.   Storm water sampling data summarized in EXHIBIT B, establishes that pollutant concentrations in discharges from the Facility exceed EPA Benchmark targets, which demonstrates that Basic Fibres has failed, and continues to fail, to develop, implement, or maintain BMPs at the Facility that meet BAT/BCT standards. These failures are violations of the General Permit's technology-based Effluent

Limitations, including specifically section B.3 of the 1997 Permit and sections I.D. and V.A. of the 2015 Permit.

194.  Data in EXHIBIT B evidence consistent exceedances of the California Toxics Rule numeric limits and Basin Plan standard, e.g. zinc and pH, and establish that the Facility's storm water discharges contain pollutant concentrations that cause or contribute to exceedances of applicable water quality standards in violation of the General Permit's Receiving Water Limitations.

195.  Basic Fibres has failed and continues to fail to prevent or limit significant quantities of trash from being dispersed daily to areas outside the site during both wet and dry weather. When it rains, this refuse is washed into the MS4 and flows into the Ballona Creek and downstream waters. The Facility's contributions of trash to the Receiving Waters are additional violations of the Permit's Receiving Water Limitations.

196.  Data in EXHIBIT B evidence consistent exceedances of the California Toxics Rule numeric limits and Basin Plan standards, and establish that the Facility's storm water discharges contain pollutant concentrations that adversely effect the environment and human health in violation of the General Permit's Receiving Water Limitations.

197.  Data in EXHIBIT B evidence consistent exceedances of the California Toxics Rule numeric limits and Basin Plan standards, and establish that the Facility's storm water discharges contain pollutants in quantities that threaten to cause pollution or a public nuisance in violation of the General Permit's Receiving Water Limitations.

198.  After July 2020, storm water discharges from the Facility with

concentrations of copper, lead and/or zinc above the NELs (described above at paragraphs 85-87) will be *per se* violations of the General Permit.

199.   Basic Fibres has failed, and continues to fail, to prepare, implement, review, and revise a legally adequate SWPPP in violation of the General Permit's SWPPP requirements.

200.   The Facility's SWPPPs do not contain: (i) legally adequate descriptions of industrial processes; (ii) legally adequate assessments of pollutant sources, *see*, *e.g.*, 2015 Permit, §§ X.F-G; (iii) legally adequate BMPs and BMP descriptions, *see*, *e.g.*, 2015 Permit, § X.H; (iv) a legally adequate MIP, *see*, *e.g.*, 2015 Permit, §§ X.I, XI; (v) legally adequate descriptions of all points where storm water is discharged from the Facility; and (vi) site maps with each element required by the General Permit.

201.   Basic Fibres has not requested permission from the LA Regional Board to conduct any alternative monitoring procedures.

202.   Industrial activities industrial activities occurring beyond the Facility's boundary (as described above in paragraphs 169-172) are not described or assessed in any of Basic Fibres' SWPPPs in violation of the General Permit.

203.   Basic Fibres' SWPPPs fail to include an evaluation of the effectiveness of the Facility's BMPs in violation of the General Permit.

204.   Basic Fibres has failed to complete the require Annual Evaluation, and then to revise and update its SWPPPs in response to evidence that the Facility's BMPs were and do not comply with the General Permit's technology-based or water quality-based standards.

205.   Basic Fibres has failed, and continues to fail, to effectively implement

1 BMPs described (or included by reference) in its SWPPPs and other permit

2 registration documents, including, but not limited to, plans and reports developed as

3 part of the ERA remedial procedures required by Section XII of the 2015 Permit.

4    206.   Basic Fibres has failed, and continues to fail, to design or implement any

5 BMPs (other than for trash) for industrial activities occurring beyond the Facility's

6 boundary (as described above in paragraphs 169-172) in violation of the General

7 Permit.

8    207.   Basic Fibres has failed, and continues to fail, to implement an adequate

9 MIP, most specifically by failing to collect a sufficient number of storm water

10 samples and/or during the periods prescribed by the General Permit, failing to collect

11 samples from each discharge point, failing to conduct any monitoring of industrial

12 activities occurring beyond the Facility's boundaries (as described above in

13 paragraphs 156-159), and failing to analyze collected samples for all pollutants

14 required by the General Permit.

15    208.   The inadequacy and ineffectiveness of the Facility's BMPs is, in part, the

16 result of Basic Fibres' failure to develop and implement a legally adequate SWPPP

17 and MIP.

18    209.   Basic Fibers has failed and continues to fail to submit Annual Reports or

19 complete Annual Evaluations as required by the General Permit's reporting

20 requirements.

21    210.   Basic Fibers has failed and continues to fail to conduct visual monitoring

22 of the Facility's discharge points, and then submit visual monitoring reports, in

23 violation of the General Permit's reporting requirements.

COMPLAINT                    40

211.   On July 1, 2016, the Facility entered Level 1 status for aluminum, chemical oxygen demand, iron, and zinc.

212.   On December 20, 2016, the Facility submitted an ERA Level 1 Report ("2016 Level 1 ERA Report").

213.   The 2016 Level 1 ERA Report is legally inadequate for, *inter alia*, failing to identify or assess any pollutant sources specific to aluminum, chemical oxygen demand, iron, or zinc, and for failing to contain complete descriptions of proposed new or improved BMPs that will prevent future NAL exceedances.

214.   Based on the storm water monitoring data from the 2016-2017 Reporting Year, the 2016 Level 1 ERA Report did not include new or improved BMPs necessary to bring the Facility into compliance with the General Permit.

215.   On July 1, 2017, the Facility remained in Level 1 status for aluminum and zinc, but entered Level 2 Status for chemical oxygen demand and iron.

216.   Basic Fibers submitted an ERA Level 2 Action Plan on December 29, 2017 for chemical oxygen demand and iron ("2017 Level 2 ERA Plan").

217.   The 2017 ERA Level 2 Plan is legally inadequate for, *inter alia*, failing to propose any new or additional BMPs.

218.   Basic Fibers did not revise its SWPPP in conjunction with the preparation and submittal of its 2017 Level 2 ERA Plan as required by the General Permit.

219.   Based on data from the 2017-2018 Reporting Year, the 2016 Level 1 ERA Report and 2017 Level 2 ERA Plan failed to improve the quality of storm water being discharged from the Facility.

220.   On July 1, 2018, the Facility remained in Level 2 status for chemical oxygen demand and iron, and entered Level 2 status for aluminum and zinc due to NAL exceedances for those pollutants during the 2017-2018 Reporting Year.

221.   On December 28, 2018, Basic Fibers submitted a revised ERA Level 2 Action Plan ("2018 Level 2 ERA Plan") amending its 2017 Level 2 ERA Plan to include its status (and demonstration selection) for aluminum and zinc.

222.   The 2018 Level 2 ERA Plan is legally inadequate for, *inter alia*, failing to propose any new or improved BMPs.

223.   The 2018 Level 2 ERA Plan establishes that none of the pollution control efforts proposed in the 2017 Level 1 ERA Plan were completed as scheduled.

224.   The 2018 Level 2 ERA Plan requested an extension of time, from January 1, 2019 to July 1, 2019, for submittal of the Level 2 ERA Technical Report (described above at paragraphs 145-148) for chemical oxygen demand and zinc.

225.   The LA Regional Board granted Basic Fibres' December 28, 2018 extension request.

226.   The 2018 Level 2 ERA Technical Report extension request does not include elements required by the 2015 Permit's XII.D.5.iii (as described in paragraph 148 above).

227.   The 2018 Level 2 ERA Plan, like the 2016 Level 1 ERA Report and the 2017 Level 2 ERA Plan, violates the General Permit and fails to remedy the continuing discharge of highly polluted storm water from the Facility.

228.   On June 18, 2019, Basic Fibres submitted a second request for an extension to submit the Level 2 ERA Technical Report for chemical oxygen demand

and iron. The request was ostensibly made to allow Basic Fibres more time to modify its existing storm water treatment system.

229.   The LA Regional Board granted Basic Fibres' June 18, 2019 extension request, and set a deadline of July 1, 2020 for the submittal of an ERA Level 2 Technical Report for chemical oxygen demand and iron.

230.   Basic Fibres has not submitted a request to extend the deadline for the Facility's ERA Level 2 Technical Report for aluminum and zinc.

231.   As of December 4, 2019, Basic Fibers' has not submitted a lawful ERA Level 2 Technical Report related to its ERA Level 2 status for chemical oxygen demand and iron, or for its ERA Level 2 status for aluminum and zinc.

## VI.        CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Defendant's Discharges of Contaminated Storm Water in
Violation of the General Permit's Effluent Limitations and the Act
(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

232.   LA Waterkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

233.   Basic Fibres has failed, and continues to fail, to reduce or prevent pollutants associated with industrial activities from being discharged to waters of the United States through the implementation of BMPs at the Facility that achieve BAT/BCT treatment standards.

234.   Basic Fibres discharges storm water containing concentrations of pollutants exceeding the BAT/BCT level of control during every significant rain event.

COMPLAINT                                    43

235.   Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the General Permit's Effluent Limitations and the Act. *See* 1997 Permit, § B.3; *see also* 2015 Permit, §§ I.D.32, V.A; 33 U.S.C. § 1311(b).

236.   Defendant violates and will continue to violate the General Permit's technology-based pollution control standard each and every time polluted storm water containing concentrations of pollutant exceeding the BAT/BCT level of control are discharged by Basic Fibres from the Facility.

237.   Each and every violation of the General Permit's technology-based pollution control standard is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

238.   Defendants' violations of the General Permit's technology-based pollution control standard and the Act are ongoing and continuous.

239.    Basic Fibres is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from August 25, 2013 to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

240.   An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper and the residents of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

241.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the

1  Parties.

2      WHEREFORE, LA Waterkeeper prays for judgment against Defendant as set

3  forth hereafter.

4  ### SECOND CAUSE OF ACTION

5
   **Defendant's Discharges of Contaminated Storm Water in**
6  **Violation of the General Permit's Receiving Water Limitations and the Act**
   **(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**
7
   242.   LA Waterkeeper re-alleges and incorporates all of the preceding
8
   paragraphs as if fully set forth herein.
9
   243.   Since at least August 25, 2014, Defendant has discharged contaminated
10
   storm water from the Facility containing levels of pollutants that: cause or contribute
11
   to exceedances of applicable water quality standards, adversely impact human health
12
   and the environment, and threaten to cause pollution or a public nuisance in violation
13
   of the General Permit's Receiving Water Limitations.
14
   244.   LA Waterkeeper is informed and believes, and thereon alleges, that
15
   discharges of storm water contain levels of pollutants that cause or contribute to
16
   exceedances of applicable water quality standards, adversely impact human health
17
   and/or the environment, and threaten to cause pollution or a public nuisance from the
18
   Facility, occur each time storm water discharges from the Facility.
19
   245.   Every day, since at least August 25, 2014, that Defendant has discharged
20
   polluted storm water from the Facility in violation of the General Permit is a separate
21
   and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).
22
   246.   Each and every violation of the General Permit's Receiving Water
23
   Limitations is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C.

COMPLAINT                                    45

1  § 1311(a).

2  247.  Basic Fibres is subject to an assessment of civil penalties for each and

3  every violation of the General Permit and Act occurring from August 25, 2014 to the

4  present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365;

5  40 C.F.R. § 19.4.

6  248.  An action for injunctive relief is authorized by section 505(a) of the Act.

7  33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above

8  would irreparably harm LA Waterkeeper, and Plaintiff has no plain, speedy, or

9  adequate remedy at law.

10  249.  An action for declaratory relief is authorized by 28 U.S.C. § 2201(a)

11  because an actual controversy exists as to the rights and other legal relations of the

12  Parties.

13  WHEREFORE, LA Waterkeeper prays for judgment against Defendants as set

14  forth hereafter.

15  ### THIRD CAUSE OF ACTION

16
17  **Defendant's Failure to Prepare, Implement, Review, and Update
A Lawful Storm Water Pollution Prevention Plan
(Violations of General Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

18
19  250.  LA Waterkeeper re-alleges and incorporates all of the preceding
paragraphs as if fully set forth herein.

20
21  251.  Defendant has not developed and implemented a legally adequate
SWPPP for the Facility.

22
23  252.  Each day since August 25, 2014 that Defendant has not developed,
implemented, and reviewed and updated a legally adequate SWPPP for the Facility is a

separate and distinct violation of the General Permit and section 301(a) of the Act. 33 U.S.C. § 1311(a).

253.   Defendant has been in violation of the General Permit's SWPPP requirements every day since August 25, 2014.  Violations continue each day that an adequate SWPPP for the Facility is not developed and fully implemented.

254.   Basic Fibres is subject to an assessment of civil penalties for each and every violation of the Act occurring from August 25, 2014 to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

255.   An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper, and Plaintiff has no plain, speedy, or adequate remedy at law.

256.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Defendants as set forth hereafter.

## FOURTH CAUSE OF ACTION

### Defendant's Failure to Develop and Implement
### a Lawful Monitoring and Reporting Program
### (Violations of General Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

257.   LA Waterkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

258.   Defendant has not developed and implemented a legally adequate

monitoring and reporting program for the Facility.

259.   Each day since August 25, 2014 that Defendant has not developed and implemented a lawful monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and section 301(a) of the Act, 33 U.S.C. § 1311(a).

260.   Basic Fibres is subject to an assessment of civil penalties for each and every violation of the Act occurring from August 25, 2014 to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

261.   An action for injunctive relief is authorized by Act section 505(a). 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper, and Plaintiff has no plain, speedy, or adequate remedy at law.

262.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Defendants as set forth hereafter.

### FIFTH CAUSE OF ACTION

**Defendant's Failure to Submit Complete Annual Reports and Accurately Certify Compliance in Violation of the General Permit and the Act (33 U.S.C. §§ 1311, 1342, 1365(a) and 1365(f))**

263.   LA Waterkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

264.   Defendant has not submitted complete annual reports of accurately

COMPLAINT                                             48

1  certified compliance with the General Permit in each of its annual reports submitted

2  since at least August 25, 2014.

3       265.   Each day since at least August 25, 2014 that Defendant does not

4  accurately certify compliance with the General Permit is a separate and distinct

5  violation of the Permit and section 301(a) of the Act. 33 U.S.C. § 1311(a).  Defendant

6  continues to be in violation of the General Permit's certification requirement each day it

7  maintains an inaccurate certification of compliance with the General Permit.

8       266.   Basic Fibres is subject to an assessment of civil penalties for each and

9  every violation of the Act occurring from August 25, 2014 to the present, pursuant to

10  sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

11       267.   An action for injunctive relief is authorized by section 505(a) of the Act.

12  33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above

13  would irreparably harm LA Waterkeeper and the residents of the State of California,

14  for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

15       268.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a)

16  because an actual controversy exists as to the rights and other legal relations of the

17  Parties.

18       WHEREFORE, LA Waterkeeper prays for judgment against Defendants as set

19  forth hereafter.

## RELIEF REQUESTED

21       Wherefore, Plaintiff respectfully requests that this Court grant the following

22  relief:

23            a.  Declare Defendant to have violated, and to be in violation of, the

General Permit and Act as alleged herein;

b.  Enjoin Defendant from discharging polluted storm water from the Facility except as authorized by the General Permit;

c.  Enjoin Defendant from further violating the procedural requirements of the General Permit;

d.  Order Defendant to immediately implement storm water pollution control technologies and measures that are equivalent to BAT or BCT, and that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

e.  Order Defendant to comply with the General Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f.  Order Defendant to prepare a SWPPP consistent with the General Permit's requirements and implement procedures to regularly review and update the SWPPP;

g.  Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

h.  Order Defendant to pay civil penalties of up to $37,500 per day per violation for each violation of the Act since August 23, 2014, up to and including November 2, 2015, and up to $52,414 for violations occurring after November 2, 2015 pursuant to sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1 - 19.4;

1             i.   Order Defendant to take appropriate actions to restore the quality of

2    waters impaired or adversely affected by its activities;

3             j.   Award Plaintiff's costs (including reasonable investigative, attorney,

4    witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C.

5    § 1365(d); and,

6             k.  Award any such other and further relief deemed appropriate by the

7    Court.

8

9    DATED: December 4, 2019        Respectfully submitted,

10

11                      By:   /s/ Jesse C. Swanhuyser

                          Jesse C. Swanhuyser

12                             Cooper & Lewand-Martin, Inc.

                          Attorney for Plaintiff

13

14

15

16

17

18

19

20

21

22

23

COMPLAINT                    51